**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JAMES RUSSO and PIERRE ROULIER, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CAPGEMINI AMERICA, INC.,<br><br>Defendant. | Case No. 1:26-cv-06941<br><br>**COMPLAINT – CLASS ACTION**<br><br>**DEMAND FOR JURY TRIAL** |

## INTRODUCTION

1. This case is about an employer that saddled its employees with poor investment options when better-performing alternatives were available. The employer, Capgemini America, Inc. ("Capgemini" or "Defendant"), failed to uphold its fiduciary duty of prudence under the Employee Retirement Income Security Act of 1974 ("ERISA").

2. These duties of prudence are "the highest known to the law" and require plan fiduciaries to keep "an eye single to the interests of the [ERISA] participants and beneficiaries." *Donovan v. Bierwirth*, 680 F.2d 263, 271-72 n.8 (2d Cir. 1982). By breaching these duties, Capgemini caused millions of dollars in losses to its employees' retirement accounts.

3. ERISA incorporates these duties throughout its text, treating employee retirement plans as though they were common law trusts. And it imposes these trustee-like duties on any plan fiduciary, defining as a fiduciary any entity to the extent it "exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets." 29 U.S.C. § 1002(21)(A).

4. Defendant Capgemini is an ERISA fiduciary because it exercises discretionary authority and control over a defined contribution retirement plan: the Capgemini Safe Harbor 401k Plan (the "Safe Harbor Plan"). Upon information and belief, the Plan is administered by an internal committee or fiduciary body appointed by Capgemini (the "Committee").

5. As a defined contribution plan, the Safe Harbor Plan is structured so that it provides no guaranteed return at the time of retirement, instead requiring employees to bear the risk of loss in the market.

6. Defined contribution plans are typically set up so the employer (as plan fiduciary) crafts a menu of investments from which the employees (the plan participants) may choose. "Although the defined contribution scheme allocates some power to participants, a fiduciary's menu construction is still important because poor menu construction 'leads to predictably worse outcomes for investors.'" *Stegemann v. Gannett Co., Inc.,* 970 F.3d 465, 469 n.3 (4th Cir. 2020) (quoting Ian Ayres & Quinn Curtis*, Beyond Diversification: The Pervasive Problem of Excessive Fees and "Dominated Funds" in 401(k) Plans*, 124 Yale L. J. 1476, 1507 (2015)).

7. As detailed below, Capgemini cobbled together a bad investment menu for the Safe Harbor Plan. The Safe Harbor Plan's menu reflects a haphazard process for selecting and retaining investments that resulted in plan participants bearing unnecessary costs and losses from underperforming funds.

8. Plaintiffs James Russo and Pierre Roulier are participants in the Safe Harbor Plan. Like many other Capgemini employees, Plaintiffs were harmed by Capgemini's selection and retention of high cost, underperforming investment options.

9. Plaintiffs' quarterly account statements confirm their investments in the challenged funds and other mutual funds offered through the Safe Harbor Plan's investment menus.

10. Through its imprudent process, Capgemini inflicted harm on Plaintiffs and other participants in the Plans ("Class Members"). Capgemini caused the Safe Harbor Plan to invest in imprudent options, including the following:

- **Vanguard U.S. Growth Fund:** Capgemini selected and retained the Vanguard U.S. Growth Fund (and its predecessor, the Vanguard Morgan Growth Fund), despite its systematic underperformance relative to its meaningful benchmark, the Russell 1000 Growth TR USD Index, across all relevant time periods. This persistent underperformance signaled a lack of manager skill and rendered the fund's active management fees unjustifiable. As a direct result of Capgemini's flawed, plan-wide decision-making, participants suffered a calculable growth shortfall of approximately $48,164,000 over six years on approximately $112 million of invested Plan assets.
- **Baron Growth Fund:** Capgemini selected and retained the Baron Growth Fund, which was an imprudent addition to the Plan in 2017 and remained a costly and unsuitable investment from 2020 through 2025. The fund exhibited persistent underperformance relative to appropriate mid-cap benchmarks, elevated fees, and excessive volatility driven by an unusually concentrated portfolio. As a result, the Baron Growth Fund caused estimated aggregate losses of approximately $30 to $32.6 million over six years.
- **Fidelity Growth Company Fund:** Capgemini selected and retained the Fidelity Growth Company Fund, Class K ("Fidelity Growth Fund"), which provided a direct benefit to a party-in-interest. This decision was not justified because, as explained below, the Fidelity Growth Fund charged fees equivalent to an actively-managed fund but did not truly provide active management.

11. Capgemini's deficient and imprudent process resulted in the selection and retention of mutual funds with poor risk-return profiles under basic metrics, including negative alpha, subpar information ratios, elevated volatility, and excessive concentration.

12. By failing to evaluate whether the Committee's strategies for choosing expensive managed investments had any reasonable prospect of paying off for plan participants, Capgemini crafted an investment menu that teemed with uncompensated risk of volatility and loss. These "uncompensated" risks are "bad risks—ones in which there is unwarranted danger of loss, or volatility that is not compensated by commensurate opportunities for gain." Restatement (Third) of Trusts § 90 (2007).

13. Plaintiffs have standing to bring this action because they participated in the Plans during the Class Period and suffered financial injury as a result of Capgemini's conduct. Plaintiffs and Class Members are entitled to recover losses to the Safe Harbor Plan, including the difference between the value of their accounts as they exist today, or as of the date of distribution, and the value those accounts would have had absent Capgemini's breaches of duty.

14. Plaintiffs' quarterly account statements confirm that they incurred ongoing losses due to the imprudent investment options and excessive fees charged by the Safe Harbor Plan. For example, Plaintiffs' statements document diminished returns resulting from the challenged investment options.

## JURISDICTION AND VENUE

15. Plaintiffs bring this action under 29 U.S.C. §§ 1132(a)(2), (3). These sections allow plan participants to sue on behalf of ERISA plans to remedy breaches of duty and to obtain appropriate equitable and monetary relief under 29 U.S.C. § 1109.

16. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1) because this case presents a federal question arising under ERISA.

17. Under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b), venue is proper because Capgemini maintains its principal place of business in this district and regularly conducts business in this district. Among other things, this district is where Capgemini carried out the acts and practices that give rise to this case.

## PARTIES

### ***Plaintiffs, Class Members, and Defendant***

18. Plaintiff James Russo is a participant in the Safe Harbor Plan. At all relevant times, Russo held investments in the Safe Harbor Plan that were offered and subject to the investment decisions, oversight, and processes of Plan fiduciaries. These assets included the Baron Growth Fund.

19. Plaintiff Pierre Roulier is a participant in the Safe Harbor Plan. At all relevant times, Roulier held investments in the Safe Harbor Plan that were offered and subject to the investment decisions, oversight, and processes of the Plan fiduciaries. These assets included the Fidelity Growth Fund.

20. The Class Members consist of other plan participants in the Safe Harbor Plan and the FSU Plan who, during the Class Period, held any of the challenged mutual fund investment options described below.

21. Capgemini America, Inc. is a corporation with its principal office located in New York, New York, and is a citizen of the State of New York.

22. Capgemini America, Inc. is a subsidiary of Capgemini SE, a global information technology services and consulting company. Upon information and belief, Capgemini America, Inc. is the plan sponsor responsible for the administration of the Safe Harbor Plan.

23. Capgemini retains control over its employees, Board, departments, agents, and vendors who perform fiduciary functions in respect of the Safe Harbor Plan, including the power to appoint or terminate, determine levels of compensation and vendors.

24. Capgemini America, Inc. is the "plan sponsor" of the Safe Harbor Plan under 29 U.S.C. § 1002(16)(B).

25. The Plan is an "employee pension benefit plan," 29 U.S.C. § 1002(2)(A), and "defined contribution plan," 29 U.S.C. § 1002(34).

26. The Safe Harbor Plan hired Fidelity Investments Institutional ("Fidelity") as the Plan's trustee and recordkeeper, but the Committee retained investment discretion. Upon information and belief, Plaintiffs allege that the Committee consists of individuals appointed by Capgemini to oversee the Safe Harbor Plan's investment options.

27. The Committee is responsible for selecting, monitoring, and removing investment options for the Safe Harbor Plan. Upon information and belief, the Committee's Investment Policy Statement ("IPS") establishes criteria for monitoring investment options at least annually. An IPS is generally meant to lay out the process by which a fiduciary explains its rationale for investments. A prudent IPS will provide specific reasons for the investment menu, not generic commentary.

28. Here, Plaintiffs requested the IPS before suit, but Capgemini refused to provide it. This refusal supports the inference of an imprudent process.

29. On June 18, Capgemini refused to provide investment-related documents, claiming they were "beyond the scope of ERISA § 104(b)(4)."

30. On the contrary, Capgemini was required to "furnish a copy of . . . other instruments under which the plan is established or operated." 29 U.S.C. §1024(b)(4).

31. The Plan's IPS and Service Agreement are instruments under which the Plan is operated. According to Section 8.01 of the Plan's Fidelity Basic Plan Document No. 17 ("Plan Document"), "[t]he Accounts of Participants shall be invested and reinvested only in Permissible Investments generally described in the Service Agreement." The Plan Document defines "Permissible Investment" as "each investment available for investment of assets of the Plan as generally described in the Service Agreement."

32. The same Plan Document defines "Service Agreement" to include any "written agreement" that "relat[es] to the provision of investment and other services":

> (zz) 'Service Agreement' means the agreement between the Employer and the Pre-Approved Plan Provider (or an agent or affiliate of the Pre-Approved Plan Provider) relating to the provision of investment and other services to the Plan and shall include any addendum to the agreement and any other separate written agreement between the Employer and the Pre-Approved Plan Provider (or an agent or affiliate of the Pre-Approved Plan Provider) relating to the provision of services to the Plan.

33. Thus, the Plan Document requires that investments be limited to those "Permissible Investments" described in a "Service Agreement." In turn, "Service Agreement" includes "any other written agreement" that "relat[es] to the provision of investment." This broad definition encompasses any IPS or other agreement describing the Plan's acceptable investments.

34. Because the Plan's investments "shall" be limited to those described in written agreements relating to investments, these agreements are "instruments under which the plan is established or operated." 29 U.S.C. §1024(b)(4).

35. Capgemini has failed to produce any agreement describing the Plan's Permissible Investments. Its refusal to do so supports the inference that these documents would not justify Capgemini's selection of the assets challenged below.

***The Safe Harbor Plan***

36. The information herein regarding the Safe Harbor Plan is based on information obtained from recent independent audits and Form 5500 filings submitted by Capgemini to the U.S. Departments of Treasury and Labor, available at www.efast.dol.gov.

37. The Safe Harbor Plan is a 401(k) defined contribution plan. Upon information and belief, the Safe Harbor Plan was first filed for tax-exempt status in 2017. The Plan holds assets and has participants as reflected in its most recent Form 5500 filings.

38. As explained above, the Safe Harbor Plan is a defined contribution plan in which the plan sponsor, Capgemini, is responsible for creating a menu of investment options for participants.

## LEGAL BACKGROUND

39. ERISA imposes strict fiduciary duties of prudence upon Capgemini as a fiduciary of the Safe Harbor Plan. These duties are "derived from the common law of trusts." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015). So, "[i]n determining the contours of an ERISA fiduciary's duty, courts often must look to the law of trusts." *Id.*

40. The duty of prudence appears, among other places, in the following statutory text:

> A fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—
>
> A. for the exclusive purpose of:
>    i. providing benefits to participants and their beneficiaries; and
>    ii. defraying reasonable expenses of administering the plan;
>
> B. with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

> C. by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and
>
> D. in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III.

29 U.S.C. § 1104(a)(1).

41. ERISA similarly imports the trust law duty of loyalty by stating that fiduciaries must act "solely in the interest of the participants and beneficiaries." 29 U.S.C. § 1104(a)(1).

42. To supplement the duty of loyalty, ERISA prohibits certain transactions between the plan and any party-in-interest:

> Except as provided in section 1108 of this title:
>
> (1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect—
>
> (A) sale or exchange, or leasing, of any property between the plan and a party in interest;
>
> (B) lending of money or other extension of credit between the plan and a party in interest;
>
> (C) furnishing of goods, services, or facilities between the plan and a party in interest;
>
> (D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan[.]

29 U.S.C. § 1106(a).

43. These duties apply to all of Capgemini's discretionary actions, including its selection of the investment menu for Plan participants.

## FACTUAL ALLEGATIONS

44. Plan fiduciaries ordinarily attempt to memorialize their investment selection and retention processes through an IPS. Depending on how it is structured, an IPS may reflect a prudent or imprudent process.

45. All Plan investments for the Capgemini Safe Harbor Plan were managed by a single Committee guided by a single IPS. Upon information and belief, Capgemini's IPS establishes criteria for monitoring investment options, including performance versus benchmarks, risk measures, and expense ratios. Despite establishing these monitoring criteria, the Committee failed to apply them prudently and appears to have ignored these factors.

46. During the Class Period, the Committee engaged in imprudent actions that breached the duty of prudence, evidencing a flawed process for selecting and retaining investments.

47. Plaintiffs are adequate class representatives as they invested in funds impacted by each breach of duty described above. Plaintiffs' quarterly account statements confirm that during the Class Period, Plaintiffs invested in at least the following funds within the Safe Harbor Plan:

- Vanguard U.S. Growth Fund;
- Fidelity Growth Fund; and
- Baron Growth Fund.

48. To review past actions, Plaintiffs, through counsel, examined Capgemini's Annual Return/Report of Employee Benefit Plan (Form 5500) for the Safe Harbor Plan filed with the U.S. Departments of Treasury and Labor.

### A. Capgemini Selects and Retains Funds Known for Underperforming Their Benchmarks and Scoring Poorly Across Industry Risk-and-Reward Metrics

49. Capgemini's failure was selecting and retaining mutual funds that were known to lag behind their benchmarks and peers with similar aims and investment styles. Plaintiffs and Class Members incurred their significant losses when Capgemini selected and retained the Vanguard U.S. Growth Fund and the Baron Growth Fund despite their persistent underperformance.

50. These choices reflect an ongoing pattern of Capgemini failing to adequately monitor mutual funds by applying standard metrics for acceptable risk and return, especially when

compared to costs. These risk/return metrics include index benchmarks, Morningstar ratings, Sharpe Ratios, and Information Ratios ("IR").

51. "Alpha" measures how much value a manager adds beyond simply matching the market's returns. A mutual fund's alpha is positive if it beats its benchmark. An important objective for each investor or portfolio manager should be to strive for a positive alpha. This is the "value added" for departing from the overall market return and bearing the risk of management, turnover, and fees.

52. The IR measures how much extra return a fund consistently generates when compared with a benchmark. It effectively measures a fund's alpha, or excess returns compared to the index, against the volatility of those returns. The IR is often used to gauge the skill of managers of mutual funds, hedge funds, and other managed funds. In a fiduciary account, an IR below 0.5 is generally considered insufficient to justify inclusion.

53. The Sharpe Ratio and IR are measures of risk relative to return, but they use different metrics. The Sharpe Ratio measures "risk-adjusted return," measuring return against an investment considered risk-free, such as U.S. Treasuries, and measuring risk by volatility, or "standard deviation" (how much the asset's price swings up and down).

54. The difference between the Sharpe Ratio and IR is explained in the chart below, available at https://www.investopedia.com/terms/i/informationratio.asp.

**Information Ratio vs. Sharpe Ratio**

| Feature | Sharpe Ratio | Information Ratio |
|---|---|---|
| **Focus** | Overall risk-adjusted return | Active management skill (relative to a benchmark) |
| **Risk Type** | Total risk (volatility) | Active risk (tracking error) |
| **Benchmark** | Risk-free rate (e.g., Treasury bills) | A relevant market index (e.g., S&P 500) |
| **Interpretation** | Higher = Better overall risk-adjusted return | Higher = Better active management skill |
| **Use Case** | General investment evaluation | Evaluating actively managed funds or portfolios |
| **What's Good?** | Depends, but greater than one is generally considered good | Depends, but greater than 0.5 is often considered good, and anything over 1.0 is excellent. |

55. Before selecting an investment menu for an ERISA plan, a prudent fiduciary would know to review an asset's Sharpe Ratio and IR. In a fiduciary account, an IR below 0.5 and a Sharpe Ratio below 1.0 are generally considered insufficient to justify inclusion. These measures are used to ensure that a fund does not add uncompensated risk to a portfolio.

56. A mutual fund's IR becomes especially important if it is a managed fund, as such funds market their alleged propensity to beat their benchmarks.

57. Managed funds charge fees in exchange for a reasonable likelihood of consistently beating their benchmarks. If a managed fund has an IR below 0.5, it is effectively charging a premium price for no consistent benefit. This is classic uncompensated risk.

58. "Turnover" refers to a fund manager's rate of trading, resulting in added transaction costs from the buying and selling of securities. The turnover rate represents the percentage of the mutual fund's holdings that changed over the past year.[1] Put differently, "[t]urnover rates measure how often a fund changes its investments, with higher rates meaning the fund frequently buys and

[1] https://www.investopedia.com/ask/answers/051915/how-should-i-use-portfolio-turnover-evaluate-mutual-fund.asp.

sells stocks or bonds. . . . '[S]ubstantial turnover' [can] create[] transaction costs," and "[a] turnover rate above 30% 'warrants close analysis by investment professionals as it can suggest that the manager is not following a disciplined investment strategy." *Johnson v. Parker-Hannifin Corp.*, 122 F.4th 205, 210 (6th Cir. 2024) (quoting allegations).

59. Four categories of these turnover-related costs are recognized by the U.S. Securities and Exchange Commission ("SEC"). The four categories of transactions costs are:

1. Commissions: Charges that a broker collects to act as agent for a customer in the process of executing and clearing a trade.
2. Spread Costs: Costs incurred when a fund buys a security from a dealer at the "asked" price (slightly above current value) or sells a security to a dealer at the "bid" price (slightly below market value). The difference between the bid price and the asked price is known as the "spread."
3. Market Impact Costs: Costs incurred when the price of a security changes as a result of the effort to purchase or sell the security.
4. Opportunity Costs: Costs related to missed or incomplete trades.

60. These turnover-related costs are *excluded* from the expense ratio of collective funds, exchange-traded funds, and mutual funds. *See* "Turnover ratio and the performance of mutual funds," Journal of Finance and Accountancy, Vol. 28;[2] C. Frohlich & N. Ozdemir, "Turnover ratio and the performance of mutual funds," 2020.[3]

61. High turnover often results in increased costs for the fund due to the payment of spreads and commissions when buying and selling stocks. These increased costs are passed on to the investors and are reflected in the fund's return overall.[4] Turnover costs in a mutual fund are approximately 1% of the turnover rate.

62. The SEC estimates that transaction costs "can greatly exceed the explicit costs."[5]

---

[2] https://aabri.com/manuscripts/203187.pdf.

[3] https://www.semanticscholar.org/paper/Turnover-ratio-and-the-performance-of-mutual-funds-Frohlich-Ozdemir/dd36140addc8df8d853d2ffa11a0b42db4a7f9aa.

[4] https://www.investopedia.com/terms/t/turnoverratio.asp.

[5] https://www.sec.gov/rules-regulations/2003/12/request-comments-measures-improve-disclosure-mutual-fund-transaction-costs.

63. In other published documents, regulators and fund management companies recognize that transaction costs are significant and relevant to investors, and most estimate that these costs can be equal to or larger than a fund's expense ratio.

64. For these reasons, a prudent fiduciary would carefully monitor any fund that incurred a turnover rate greater than 30%.

### 1. Vanguard U.S. Growth Fund

65. During the Class Period, the Safe Harbor Plan invested in the Vanguard U.S. Growth Fund Admiral Shares. The fund's fact sheet identified the Russell 1000 Growth TR USD as the Vanguard-chosen benchmark.

66. The Vanguard U.S. Growth Fund was a poor fiduciary choice for the Safe Harbor Plan from inception: the fund systematically underperformed its meaningful benchmark (Russell 1000 Growth) across every relevant lookback, signaling no manager skill and making active fees unjustifiable in participants' interests.

***Table 1: Morningstar Ratio for Vanguard U.S. Growth Fund (Pre-Plan Period, 2013–2019)***

| Returns v. Risk | 2019 | 2018 | 2017 | 2016 | 2015 | 2014 | 2013 |
|---|---|---|---|---|---|---|---|
| Vanguard U.S. Growth Fund Admiral™ Shares | 0.59 | 0.32 | 0.29 | (0.03) | 0.22 | (0.15) | 0.29 |

67. The record shows negative alpha and an information ratio for the 10-year pre-plan window (2007–2016), and deeper evidence from 2002–2016 confirms an average annual lag of roughly 1.41% (1.5% geometric), meaning the benchmark beat the fund persistently over 15 years.

***Table 2: Information Ratio for Vanguard U.S. Growth Fund (Limitations Period, 2020–2025)***

| Returns v. Risk (Morningstar Information Ratio) | 2025 | 2024 | 2023 | 2022 | 2021 | 2020 |
|---|---|---|---|---|---|---|
| Vanguard U.S. Growth Fund Admiral Shares | -0.56 | 0.1 | 0.02 | -0.17 | 0.91 | 1.16 |

68. The average IR for the Vanguard U.S. Growth Fund during the limitations period (2020–2025) was 0.24, far below the 0.5 minimum threshold for prudent fiduciary inclusion. The observed annual lag or negative alpha was 324 basis points for 2020–2025.

**a. Turnover Costs**

69. The Vanguard Morgan Growth Fund (VMRGX), selected by Capgemini in the Plan's initial year (2017), was merged into the Vanguard U.S. Growth Fund in the 2019 plan year.

70. Prior to that merger, the Morgan Growth Fund exhibited multiple warning signs that should have prompted heightened scrutiny by Capgemini in 2017, 2018, and early 2019. Notably, the fund announced its liquidation and termination, with its assets subsequently rolled into the Vanguard U.S. Growth Fund in 2019.

71. As of December 31, 2018, the Vanguard U.S. Growth Fund likewise underperformed its primary benchmark, the Russell 1000 Growth TR USD Index, as reflected by negative alpha over the 3-, 5-, 10-, and 15-year periods. During the 2018 plan year, the Vanguard Morgan Growth Fund reported a portfolio turnover rate of approximately 47%.

72. Capgemini knew or should have known that the Morgan Growth Fund exhibited persistently high turnover, averaging approximately 50% annually from 2013 through 2018, as shown below:

***Table 3: Portfolio Turnover – Vanguard Morgan Growth Fund (2013–2018)***

| 2018 | 2017 | 2016 | 2015 | 2014 | 2013 |
|---|---|---|---|---|---|
| 47% | 51% | 51% | 52% | 53% | 53% |

73. Following the 2019 merger, the Vanguard U.S. Growth Fund continued to exhibit elevated turnover. In the 2020 plan year, the fund turned over approximately 38% of its 256 holdings. From 2020 through 2025, the fund's average annual turnover rate remained high at approximately 34%, as reflected below:

***Table 4: Portfolio Turnover – Vanguard U.S. Growth Fund (2020–2025)***

| Turnover % | 2025 | 2024 | 2023 | 2022 | 2021 | 2020 |
|---|---|---|---|---|---|---|
| Vanguard US Growth Fund | 29 | 37 | 37 | 23 | 41 | 38 |

74. The Vanguard U.S. Growth Fund posed significant risk to Plan participants due to its elevated turnover, increasing concentration, and sustained volatility. Morningstar defines its "Risk Rating (Volatility)" as a relative ranking of a fund within its investment category based solely on price volatility (standard deviation of returns), with "A" representing the lowest risk and "E" representing the highest risk.

75. As shown below, the Vanguard U.S. Growth Fund consistently received high-risk ratings, including repeated "E" ratings (the highest risk level), over multiple years:

***Table 5: The Morningstar® Risk Ratings – Vanguard U.S. Growth Fund (2013–2025)***

| 2025 | 2024 | 2023 | 2022 | 2021 | 2020 | 2019 | 2018 | 2017 | 2016 | 2015 | 2014 | 2013 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| E | E | E | E | E | E | D | D | C | C | D | D | D |

76. Capgemini knew or should have known of these persistent risk indicators and, accordingly, should have undertaken a thorough and ongoing investigation into whether the

Vanguard U.S. Growth Fund remained a prudent investment option following the liquidation of the Morgan Growth Fund.

77. Following the 2019 merger, the Vanguard U.S. Growth Fund also became increasingly concentrated, allocating a substantial percentage of assets to a limited number of holdings. Specifically, the fund concentrated a growing share of Plan participants' assets in its top ten holdings, as shown below:

***Table 6: Percentage of Assets in Top 10 Holdings – Vanguard U.S. Growth Fund (2019–2025)***

| 2025 | 2024 | 2023 | 2022 | 2021 | 2020 | 2019 |
|---|---|---|---|---|---|---|
| 57.4 | 52.9 | 46.21 | 39.19 | 36.45 | 39.12 | 29.47 |

78. Further increasing risk, the number of holdings within the Vanguard U.S. Growth Fund declined significantly in recent years, reflecting reduced diversification. The fund's holdings decreased from 256 securities in 2020 (and over 300 in 2021–2022) to just 112 securities by 2025, as shown below:

***Table 7: Number of Holdings – Vanguard U.S. Growth Fund (2020–2025)***

| 2025 | 2024 | 2023 | 2022 | 2021 | 2020 |
|---|---|---|---|---|---|
| 112 | 120 | 126 | 287 | 301 | 256 |

79. This increasing concentration, combined with elevated turnover and persistent volatility, materially increased the risk profile of the fund and rendered it imprudent for inclusion in the Plan.

80. Capgemini's flawed plan-wide decision-making and actions resulted in a calculable growth shortfall of $48,164,000 over six years on $112 million of participants' money invested in the initial plan year, 2020.

81. This pattern of underperformance against the meaningful benchmark could have been observed, and the fees and high turnover costs could have been prevented from harming participants.

82. By the first year of the limitations period, the 10-year geometric lag remained negative, and the fund posted outsized single-year underperformance (−15% in 2021; −10.5% in 2022), with continued lag in 2024 and 2025, implying any multi-year lookback is negative.

83. If the Committee had considered this information, it would have removed the Vanguard U.S. Growth Fund in 2020, 2021, 2022, 2023, or 2024. Instead, Capgemini retained the fund through at least January 1, 2025.

### *2. Baron Growth Fund*

84. The Baron Growth Fund was included as an investment option in both the FSU Plan and the Capgemini Safe Harbor 401(k) Plan.

85. The fund's portfolio manager consistently maintained an unusually concentrated portfolio, keeping the number of holdings below 100 securities since at least 2013, with an average of approximately 62 holdings. This level of concentration was atypical when compared to similarly situated funds.

***Table 8: Number of Holdings – Baron Growth Fund (2013–2025)***

| 2025 | 2024 | 2023 | 2022 | 2021 | 2020 | 2019 | 2018 | 2017 | 2016 | 2015 | 2014 | 2013 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 25 | 33 | 41 | 46 | 54 | 54 | 63 | 60 | 61 | 64 | 91 | 104 | 103 |




86. Plaintiffs further identified significant "style drift" in the Baron Growth Fund, particularly beginning around 2021. The fund materially increased its allocation to small-cap stocks, nearly doubling its exposure relative to 2018 (the year after the fund was added to the Plan's investment menu). This shift exposed participants to a materially different risk profile than originally represented.

***Table 9: Small-Cap Allocation – Baron Growth Fund (2018–2025)***

| 2025 | 2024 | 2023 | 2022 | 2021 | 2020 | 2019 | 2018 |
|---|---|---|---|---|---|---|---|
| 45.97 | 32.6 | 27.57 | 26.68 | 20.30 | 13.00 | 12.91 | 10.92 |

87. During the same period, the Baron Growth Fund became increasingly concentrated in a limited number of securities. From 2020 through 2025, approximately 44% of fund assets were invested in just ten holdings, while the total number of holdings continued to decline. By contrast, comparable mid-cap peer funds held hundreds of securities—approximately 506 holdings in 2022, 460 in 2023, 436 in 2024, and 404 in 2025—demonstrating that the Baron Growth Fund's concentration was extreme relative to its peers.

***Table 10: Number of Holdings – Baron Growth Fund (2013–2025)***

| 2025 | 2024 | 2023 | 2022 | 2021 | 2020 | 2019 | 2018 | 2017 | 2016 | 2015 | 2014 | 2013 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 25 | 33 | 41 | 46 | 54 | 54 | 63 | 60 | 61 | 64 | 91 | 104 | 103 |

88. Elevated turnover and concentration in a limited number of securities increase volatility and overall risk, as measured by standard deviation. Despite these clear indicators, Capgemini failed to act prudently in selecting and retaining the Baron Growth Fund. Their conduct was inconsistent with the duties imposed under 29 C.F.R. § 2550.404a-1, which requires fiduciaries to give appropriate consideration to factors affecting the risk-return profile of an investment and to act solely in the interest of plan participants and beneficiaries.

89. Had Capgemini appropriately weighed the fund's concentration, style drift, and associated risk characteristics, they would not have permitted Plan participants' retirement assets to remain invested in the Baron Growth Fund. Instead, Capgemini allowed participants' wages to be invested in an imprudent option, violating their duty of prudence.

### B. Capgemini's Imprudent Selection, Retention, and Failure to Remove the Baron Growth Fund Caused Tens of Millions in Participant Losses

90. First, Capgemini acted imprudently in selecting the Baron Growth Fund in 2017, when the Safe Harbor Plan was established. Second, Capgemini breached its ongoing duty to monitor and remove imprudent investments by retaining the Baron Growth Fund from 2020 through 2025, despite clear indicators of underperformance, excessive fees, and elevated volatility driven by an unusually concentrated portfolio.

91. As shown below, the Baron Growth Fund consistently allocated a substantial portion of assets to a limited number of holdings, with significantly higher concentration than comparable peer funds, which typically maintained approximately 25% of assets in their top ten holdings:

***Table 11: Percentage of Assets in Top 10 Holdings – Baron Growth Fund (2017–2025)***

| 2025 | 2024 | 2023 | 2022 | 2021 | 2020 | 2019 | 2018 | 2017 |
|---|---|---|---|---|---|---|---|---|
| 76.2 | 69.2 | 64.67 | 62.66 | 55.67 | 55.24 | 48.58 | 46.77 | 44.08 |

92. The historical record available to Capgemini at the time of selection and during the monitoring period demonstrated persistent and material underperformance. Prior to the limitations period, the Baron Growth Fund lagged the Morningstar U.S. Mid Cap Growth Index by approximately 37 basis points annually (geometric) from 2002–2016, and by approximately 134 basis points on a risk-adjusted basis when compared to Morningstar's best-fit Mid Cap Blend benchmark. From 2005 through 2019, the fund continued to trail appropriate benchmarks by approximately 30 basis points annually.

93. During the limitations period (2020–2025), the fund's underperformance materially worsened. The Morningstar U.S. Mid Cap benchmark returned approximately 10.44% annually (geometric), compared to approximately 4.3% for the Baron Growth Fund. This performance deficit was accompanied by substantial risk indicators, including elevated tracking error (approximately 530 basis points annually over 15 years) and significant volatility (approximately 591 basis points annually over 10 years).

94. At the same time, the fund's expense ratio increased from approximately 103 basis points in 2020 to 108 basis points in 2025, further compounding participant losses.

95. This expense ratio far exceeded what was typical. In 2019, expense ratios for all equity mutual funds averaged 0.52 percent, and expense ratios for actively-managed funds averaged 0.74 percent.[6] By 2021, "the average expense ratio of actively managed equity mutual

[6] https://www.ici.org/news-release/20_news_trends.

funds fell to 0.68 percent," while "[i]ndex equity mutual fund expense ratios fell from 0.27 percent in 1996 to 0.06 percent in 2021."[7] Thus, the Baron Growth Fund's expense ratio exceeded the average for actively-managed equity funds by about 50%, and exceeded the average for index funds by nearly 2,000%. Plaintiffs and Class Members had to bear these costs.

96. At the same time, the Baron Growth Fund failed to provide a risk-adjusted return justifying these increased costs. Its rolling 10-year information ratio deteriorated to an average of approximately -0.14 during the 2020–2025 period.

97. Plan participants had approximately $61.6 million invested in the Baron Growth Fund at the start of the limitations period. Relative performance deficits of approximately 600 to 616 basis points compared to prudent mid-cap alternatives resulted in estimated losses of approximately $30 to $32.6 million over six years, excluding additional participant contributions. These losses occurred alongside a significant decline in the fund's overall assets under management, from approximately $6.3 billion in 2021 to approximately $1.465 billion as of March 31, 2026.

98. Given these facts, and the availability of lower-cost, better-performing, and more appropriately diversified mid-cap alternatives, Capgemini's decision to select and retain the Baron Growth Fund failed to satisfy ERISA's duty of prudence. A prudent fiduciary would have either refrained from selecting the fund in 2017 or removed it during the monitoring period. Capgemini's failure to do so caused substantial and quantifiable losses to Plan participants.

**C. Capgemini Violates its Duties of Prudence and Loyalty By Engaging in Prohibited Dealings with Parties in Interest.**

[7] https://www.ici.org/system/files/2022-03/per28-02_2.pdf.

99. The Safe Harbor Plan hired Fidelity as the Plan's trustee and recordkeeper. The Safe Harbor Plan's 5500 filing discloses that "[c]ertain investments are shares of mutual funds and a common collective trust managed by Fidelity. Fidelity is the Plan's trustee and recordkeeper; therefore, transactions related to these investments and record-keeping fees qualify as party-in-interest transactions."

100. By causing the Safe Harbor Plan to invest in Fidelity's mutual funds, Capgemini and the Committee violated ERISA Section 1106. This section forbids a fiduciary from causing the plan to enter any transaction for the "furnishing of services . . . between the plan and a party in interest," 29 U.S.C. § 1106(a)(1)(C), or the "transfer to, or use by or for the benefit of a party in interest, of any assets of the plan." *Id.*, § 1106(a)(1)(D).

101. This general bar is subject to an exception for transactions that are "necessary for the . . . operation of the plan," but only if "no more than reasonable compensation [was] paid." 29 U.S.C. § 1108(b)(2). It is the fiduciary's burden to prove these elements as an affirmative defense. *Cunningham v. Cornell Univ.*, 604 U.S. 693, 702 (2025).

102. Here, Capgemini and the Committee caused the Safe Harbor Plan to invest in the Fidelity Growth Fund, thereby transferring Plan assets for the benefit of Fidelity, a party in interest. Capgemini cannot prove the necessity of this arrangement or the reasonability of the fees paid to Fidelity as a result.

103. The Fidelity Growth Fund is marketed and priced as an actively managed equity fund, charging Plan participants an average expense ratio of 51 basis points (0.51%) from the 2020 plan year through the 2025 plan year. These fees are paid to Fidelity.

104. The Fidelity Growth Fund's portfolio was not, in practice, actively managed to a degree that could justify those fees. Its active share—the standard quantitative measure of the

degree to which a fund's holdings differ from its benchmark index—declined steadily over the Class Period.

105. In 2017, the Fidelity Growth Fund's active share stood at 55.02%. By 2020, its average active share had already fallen to 51.8%. This decline then continued, falling to 49.17% in July 2021, to 45% by January 2022, and to an average of 42.20% during 2023.

106. By September and October 2024, the Fidelity Growth Fund's active share had dropped to 33.92% and 33.83%, respectively. Although there was a modest rebound to 36.90% by January 2026, the multi-year average from June 2020 through February 2026 was just 42.53%.

107. This stark decline in active share meant the Fidelity Growth Fund was, in substantial part, replicating its benchmark index. Such a strategy was available to Plan participants through passively-managed index funds at a fraction of the cost.

108. A prudent fiduciary would have flagged this declining active share and replaced the Fidelity Growth Fund with a low-cost index fund or a fund that was truly actively managed.

109. A loyal fiduciary would not have allowed Fidelity to be paid fees for active management when it was not truly providing that service.

## CLASS ACTION ALLEGATIONS

110. Plaintiffs bring this action pursuant to Rule 23 on behalf of the class of persons described herein and on behalf of the Safe Harbor Plan. Plaintiffs reserve the right to revise their class definitions and to propose other or additional classes in subsequent pleadings or in their motion for class certification, after discovery in this action.

111. Plaintiffs bring this action on behalf of themselves and the Class, which is defined as participants in and beneficiaries of the Safe Harbor Plan, but excluding Capgemini's Committee members; any person who was or is an officer, director, employee, or a shareholder of 5% or more

of the equity of Capgemini or is or was a partner, officer, director, or controlling person of Capgemini; the spouse or children of any individual who is an officer, director or owner of 5% or more of the equity of Capgemini; Plaintiffs' counsel; judges of the Court in which this case is pending and their current spouse and children; and the legal representatives, heirs, successors and assigns of any such excluded person.

112. The Class Period is from the beginning of the applicable statute of limitations period to Plaintiffs' claims through the date of judgment.

113. Plaintiffs assert the Counts against Capgemini on behalf of the Safe Harbor Plan and, in acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Safe Harbor Plan, as an alternative to direct individual actions on behalf of the Safe Harbor Plan under 29 U.S.C. § 1132(a)(2) and (3), Plaintiffs seek to certify this action as a class action on behalf of all participants and beneficiaries of the Safe Harbor Plan.

114. **Numerosity:** The Classes are so numerous that joinder of all Class members is impracticable. At present, the Safe Harbor Plan has over 20,000 participants.

115. **Typicality:** Plaintiffs' claims are typical of the Class members' claims. Like other Class members, Plaintiffs are current or former participants in the Safe Harbor Plan who have suffered injuries as a result of Capgemini's mismanagement of the Safe Harbor Plan. Capgemini treated Plaintiffs consistently with other Class members with regard to the Safe Harbor Plan. Capgemini managed the Safe Harbor Plan as a single entity, in an omnibus account, and therefore Capgemini's imprudent decisions affected all Plan participants similarly. All Class members are trust beneficiaries of the same trust and use the same custodian and recordkeeping system.

116. These mutual fund securities are not registered to or owned directly by Plan participants—unlike individual retirement accounts (IRAs). The Safe Harbor Plan's trusts own the

SEC-registered securities and buy and sell them at an omnibus or net aggregate trust level, settling shares daily with the recordkeeper, which updates individual participant account balances through daily valuation.

117. Therefore, each Capgemini Plan participant or Class Member is a beneficiary of the same trust and participates through a common trust company and a common recordkeeping firm.

118. Plaintiffs' claims are typical of the claims of the Class. Plaintiffs have no interests antagonistic to the Class, and questions of law and fact are common to Class members and predominate over any individualized questions. Plaintiffs understand that this matter cannot be settled without Court approval.

119. **Adequacy**: Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs' interests are aligned with those of the Class, and Plaintiffs have retained counsel experienced in ERISA class action litigation. Plaintiffs have no conflicts of interest that would impair their ability to represent the Class.

120. Plaintiffs have retained counsel with extensive experience in ERISA and trust investment management litigation, including matters with over $1 billion in trust assets at stake.

121. **Commonality**: Common questions of law and fact predominate, including but not limited to:

a. Whether Capgemini breached its duty of prudence by failing to adequately monitor and evaluate the Safe Harbor Plan's investment options;

b. Whether Capgemini failed to evaluate returns and risks against meaningful benchmarks and peers with similar aims and characteristics;

c. Whether Capgemini failed to prudently monitor and remove imprudent Plan investments;

d. Whether Capgemini breached its duty to properly select investments;

e. Whether Capgemini breached its duty to monitor Plan investments;

f. Whether Capgemini failed to investigate and consider lower-cost, better-performing alternatives;

g. The proper measure of monetary relief; and

h. The proper form of equitable and injunctive relief.

122. Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) because prosecuting separate actions against Capgemini would create a substantial risk of inconsistent or varying adjudications, resulting in incompatible standards of conduct governing Capgemini's fiduciary obligations. Absent class treatment, different courts could impose conflicting requirements on Capgemini's management and administration of the Safe Harbor Plan.

123. Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1)(B) because adjudications as to individual Class members would, as a practical matter, be dispositive of the interests of other Plan participants or would substantially impair or impede their ability to protect those interests. Any equitable relief ordered by the Court—such as the removal of imprudent Plan investments or fiduciaries—would necessarily affect the Safe Harbor Plan as a whole. Likewise, the accounting for losses and restoration of Plan assets required under 29 U.S.C. §§ 1109 and 1132 would inure to the benefit of all participants, rendering individual actions impracticable.

124. Class certification is further appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Classes predominate over any questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this action. Capgemini's conduct, as alleged herein, was uniform and affected all Class members in the same manner.

125. Class members have little interest in pursuing separate actions against Capgemini because the amount of each individual claim is relatively small compared to the expense and burden of individual litigation. Plaintiffs are unaware of any similar individual actions brought by Class members asserting these claims.

126. Class certification will also avoid duplicative litigation and reduce the risk of inconsistent or conflicting judgments concerning Capgemini's fiduciary practices.

127. Managing this action as a class action will not present any unusual or insurmountable difficulties, as the claims arise from common policies, practices, and fiduciary decisions applicable to the Safe Harbor Plan as a whole.

128. In the interests of justice and judicial efficiency, concentrating the litigation of all Class members' claims in a single forum is both desirable and appropriate.

**COUNT I**
**BREACH OF DUTY OF PRUDENCE**
**(Imprudent Process for Selecting and Retaining Investments)**
**29 U.S.C. § 1104(A)(1)(A)**

129. Plaintiffs incorporate by reference the allegations in paragraphs 1-128.

130. During the Class Period, Capgemini was a fiduciary of the Safe Harbor Plan under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because it exercised discretionary authority or control over Plan administration and assets.

131. Capgemini breached its duty of prudence by:

a. Selecting and retaining the Vanguard U.S. Growth Fund (and its predecessor, the Vanguard Morgan Growth Fund) despite persistent underperformance relative to its meaningful benchmark, negative alpha, excessive volatility, and high portfolio concentration.

b. Selecting and retaining the Baron Growth Fund despite persistent underperformance relative to appropriate mid-cap benchmarks, elevated fees, excessive volatility, concentrated portfolio, and style drift.

c. Selecting and retaining the Fidelity Growth Fund despite its style drift and effective passively-managed style, ignoring that this fund charged fees for active management;

d. Failing to engage in a prudent and documented process for evaluating Plan investments against meaningful benchmarks and peers, as further described in the class certification allegations; and

e. Failing to monitor and remove imprudent Plan investments and replace them with lower-cost, better-performing alternatives.

132. This common pattern of behavior led to Capgemini's selection and retention of the Fidelity Growth Fund, Vanguard U.S. Growth Fund, and Baron Growth Fund described throughout this Complaint.

133. Based on Forms 5500 filed from 2017 to the present, the Safe Harbor Plan's investment lineup reflects systemic process failures rather than isolated or reasonable fiduciary decisions.

134. Under ERISA §§ 409(a), 502(a)(2), and (a)(3) (29 U.S.C. §§ 1109(a), 1132(a)(2), and (a)(3)), Capgemini is liable to restore to the Plans all losses caused by its breaches, disgorge any profits derived from Plan assets, and provide other appropriate relief.

135. On behalf of the Plans, Plaintiffs also seek appropriate equitable relief under ERISA § 502(a)(3), recovery of prejudgment interest, and an award of attorneys' fees and costs pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g).

**COUNT II**
**PROHIBITED TRANSACTIONS WITH A PARTY-IN-INTEREST**
**29 U.S.C. § 1106(a)(1)(A), (C)–(D)**

136. Plaintiffs incorporate by reference the allegations in paragraphs 1-128.

137. ERISA § 406(a)(1), 29 U.S.C. § 1106(a)(1), prohibits a fiduciary with respect to a plan from causing the plan to engage in a transaction if the fiduciary knows or should know that such transaction constitutes: (A) a sale, exchange, or lease of any property between the plan and a party in interest; (C) the furnishing of goods, services, or facilities between the plan and a party in interest; or (D) a transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan.

138. As alleged above, Capgemini caused the Safe Harbor Plan to invest in the Fidelity Growth Fund. These transactions provided a direct benefit to a party in interest: Fidelity, the Plan's recordkeeper.

139. Capgemini cannot meet its burden of proving that an exception applies to ERISA's general prohibition of interested-party transactions.

140. Under ERISA §§ 409(a), 502(a)(2), and (a)(3) (29 U.S.C. §§ 1109(a), 1132(a)(2), and (a)(3)), Capgemini is liable to restore to the Safe Harbor Plan all losses caused by its breaches, disgorge any profits derived from Plan assets, and provide other appropriate relief.

141. On behalf of the Safe Harbor Plan, Plaintiffs also seek appropriate equitable relief under ERISA § 502(a)(3), recovery of prejudgment interest, and an award of attorneys' fees and costs pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g).

**COUNT III**
**FAILURE TO PROVIDE REQUESTED PLAN DOCUMENTS**
**IN VIOLATION OF ERISA §104(b)(4)**

142. Plaintiffs incorporate by reference the allegations in paragraphs 1-128.

143. As alleged earlier, Plaintiffs made written requests to Capgemini, the Plan Administrator, for relevant Plan documents. These documents included the Plan's IPS. Capgemini refused to produce the Plan's IPS or the Service Agreement that limits the Plan's "Permissible Investments."

144. On June 18, Capgemini refused to provide investment-related documents, claiming they were "beyond the scope of ERISA § 104(b)(4)."

145. On the contrary, Capgemini was required to "furnish a copy of . . . other instruments under which the plan is established or operated." 29 U.S.C. §1024(b)(4).

146. As explained above, the Plan's IPS and Service Agreement are instruments under which the Plan is operated.

147. The Plan Document states that the Plan's assets "shall be invested and reinvested only in Permissible Investments generally described in the Service Agreement." The Plan Document defines "Permissible Investment" as "each investment available for investment of assets of the Plan as generally described in the Service Agreement." The same Plan Document defines "Service Agreement" to include any "written agreement" that "relat[es] to the provision of investment and other services":

> (zz) 'Service Agreement' means the agreement between the Employer and the Pre-Approved Plan Provider (or an agent or affiliate of the Pre-Approved Plan Provider) relating to the provision of investment and other services to the Plan and shall include any addendum to the agreement and any other separate written agreement between the Employer and the Pre-Approved Plan Provider (or an agent or affiliate of the Pre-Approved Plan Provider) relating to the provision of services to the Plan.

148. Because the "Service Agreement" includes "any other written agreement" that "relat[es] to the provision of investment," it encompasses any IPS or other agreement describing the Plan's acceptable investments.

149. As the Plan's investments "shall" be limited to those described in written agreements relating to investments, these agreements are "instruments under which the plan is established or operated." 29 U.S.C. §1024(b)(4).

150. Capgemini has failed to produce any agreement describing the Plan's Permissible Investments.

151. Capgemini did not justify this failure on the basis that no such agreements exist. Instead, Capgemini incorrectly claimed that such documents fall outside the scope of what ERISA § 104(b)(4) requires.

152. Plaintiffs have been harmed by Capgemini's failure to provide the IPS and any other documents that constitute the Service Agreement. Capgemini's failure to provide these documents precludes Plaintiffs from fully understanding the Plan's investment strategy and process.

153. Plaintiffs therefore seek statutory penalties of up to $110 per day for each day of the Plan Administrator's noncompliance. See ERISA §502(c)(1), 29 U.S.C. §1132(c)(1), and 29 C.F.R. §2575.502c-1. Plaintiffs also seek reasonable attorneys' fees and costs under ERISA §502(g)(1), 29 U.S.C. §1132(g)(1).

## PRAYER FOR RELIEF

For these reasons, Plaintiffs, on behalf of the Safe Harbor Plan and all similarly situated Plan participants and beneficiaries, respectfully request that the Court enter judgment:

(1) declaring that Capgemini breached its duties as described above;

(2) holding that Capgemini is personally liable to make good to the Safe Harbor Plan all losses to the Safe Harbor Plan resulting from each breach of fiduciary duty, and to otherwise restore the Safe Harbor Plan to the position they would have occupied but for the breaches;

(3) determining the method by which plan losses and fiduciary profits should be calculated, and order Capgemini to provide all accountings necessary to determine the amounts Capgemini must make good to the Safe Harbor Plan under 29 U.S.C. §1109(a);

(4) holding that Capgemini must disgorge all sums of money received from improper use of assets of the Safe Harbor Plan;

(5) surcharge against Capgemini and in favor of the Safe Harbor Plan all amounts involved in any transactions which an accounting reveals were improper, excessive and/or in violation of ERISA;

(6) order equitable restitution against Capgemini;

(7) certify the Class, appoint Plaintiffs as class representatives, and appoint Plaintiffs' Counsel as Lead Class Counsel;

(8) award to the Plaintiffs and the Class their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;

(9) order the payment of interest to the extent it is allowed by law; and

(10) grant other equitable or remedial relief as the Court deems appropriate.

Respectfully submitted: August 13, 2026

*/s/ Robert R. Jimenez*
Robert Jimenez, Esq.
NY Bar No. 5814249
Bryson Harris Suciu & DeMay, PLLC
201 Sevilla Avenue, 2nd Floor
Coral Gables, FL 33134
Tel.: (786) 879-8200
rjimenez@brysonpllc.com

James R. DeMay, Esq.*
Bryson Harris Suciu & DeMay, PLLC
900 West Morgan Street
Raleigh, NC 27603
Phone: (704) 941-4648
jdemay@brysonpllc.com

Jimmy W. Mintz, Esq.*
Bryson Harris Suciu & DeMay, PLLC
201 Sevilla Avenue, 2nd Floor
Coral Gables, FL 33134
Tel.: (786) 879-8200
jmintz@brysonpllc.com

Lee Melchionni, Esq.*
LRJ Law Group, LLP
1100 H Street NW, Ste. 840
Washington, D.C. 20005
Email: lee@lrj401k.com

**Pro Hac Vice Applications Forthcoming*